# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————————————

No. 17-50042

————————————————

D.C. Docket No. 1:16-CV-277

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2018

Lyle W. Cayce
Clerk

ENTERGY TEXAS, INCORPORATED,

      Plaintiff - Appellee

v.

DONNA L. NELSON, In her official capacity as Chairman of the Public Utility Commission of Texas; BRANDY MARTY MARQUEZ, In her official capacity as a Commissioner of the Public Utility Commission of Texas; KENNETH W. ANDERSON, JR., In his official capacity as a Commissioner of the Public Utility Commission of Texas,

      Defendants - Appellants

TEXAS INDUSTRIAL ENERGY CONSUMERS,

      Intervenor Defendant - Appellant

Appeals from the United States District Court for the
Western District of Texas

Before REAVLEY, SMITH, and OWEN, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is reversed and rendered.

IT IS FURTHER ORDERED that appellee pay to appellants the costs on appeal to be taxed by the Clerk of this Court.

PRISCILLA R. OWEN, Circuit Judge, dissenting.



Certified as a true copy and issued
as the mandate on Jun 07, 2018

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50042

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2018

Lyle W. Cayce
Clerk

ENTERGY TEXAS, INCORPORATED,

        Plaintiff - Appellee

v.

DONNA L. NELSON, In her official capacity as Chairman of the Public
Utility Commission of Texas; BRANDY MARTY MARQUEZ, In her official
capacity as a Commissioner of the Public Utility Commission of Texas;
KENNETH W. ANDERSON, JR., In his official capacity as a Commissioner
of the Public Utility Commission of Texas,

        Defendants - Appellants

TEXAS INDUSTRIAL ENERGY CONSUMERS,

        Intervenor Defendant - Appellant

Appeals from the United States District Court
for the Western District of Texas

Before REAVLEY, SMITH, and OWEN, Circuit Judges.

REAVLEY, Circuit Judge:

The Federal Energy Regulatory Commission ("FERC") and the Public
Utility Commission of Texas ("PUCT") both play a role in the regulation of
energy production and sale. If they issue conflicting orders, FERC's controls.
This case is about whether, as the district court found, a certain PUCT order
conflicts with a prior FERC order. On one side, we have PUCT and a trade

No. 17-50042

association, the Texas Industrial Energy Consumers ("TIEC").  As appellants, they seek to persuade us that PUCT's order was consistent with the relevant FERC order and should therefore be enforced.  On the other side, we have Entergy Texas, Inc. ("ETI"), an operating company of Entergy Corporation. ETI brought this action to enjoin enforcement of the PUCT order and now defends the district court's ruling.  We decide that PUCT's order is not in conflict with any FERC order.  We reverse the district court and render judgment in favor of PUCT and TIEC.

## I.    BACKGROUND

Entergy Corporation is a public utility holding company dealing in electricity through its subsidiary "Operating Companies," including ETI. Entergy Operating Companies are split along state lines.  Entergy serves customers in Texas, Arkansas, Louisiana, and Mississippi, and its Operating Companies are ETI; Entergy Arkansas, Inc.; Entergy Gulf States Louisiana, L.L.C. ("EGSL"); Entergy New Orleans, Inc.; and Entergy Mississippi, Inc. This strict division did not always exist.  Prior to 2008, an entity called Entergy Gulf States, Inc. ("Entergy Gulf States") served markets in both Texas and Louisiana.  Its split led to the creation of ETI and EGSL.

Electricity is highly regulated, and both state and federal authorities play significant roles.  FERC "regulates the sale of electricity at wholesale in interstate commerce."  *Entergy La., Inc. v. La. Pub. Serv. Comm'n ("LPSC")*, 539 U.S. 39, 41, 123 S.Ct. 2050, 2053 (2003).  But at the intrastate level, state regulatory bodies have sole jurisdiction.  *F.E.R.C. v. Electric Power Supply Ass'n*, 136 S.Ct. 760, 767–68 (2016), as revised (Jan. 28, 2016).  In Texas, PUCT is the regulating authority.  Because Entergy sells electricity across state lines at both wholesale and retail levels, it must work with FERC, PUCT, and other state authorities.

2

No. 17-50042

Entergy's Operating Companies must maintain roughly equal costs of production, and FERC must make it so. The obligation to equalize costs comes primarily from FERC's Section 206 duty to ensure "reasonable" rates that are not "unduly discriminatory," 16 U.S.C. § 824e(a), but also from the "System Agreement" entered into between the Operating Companies—a FERC-approved "filed rate" for purposes of the filed rate doctrine. *See Entergy Louisiana, Inc.*, 539 U.S. at 42, 123 S.Ct. at 2053 (explaining that the System Agreement is "a tariff approved by FERC"). In 2005, a variety of factors led FERC to conclude that the Entergy System was "out of rough production cost equalization." *LPSC v. F.E.R.C.*, 522 F.3d 378, 388 (D.C. Cir. 2008) (per curiam) (quoting 113 FERC ¶ 61282, 62134 (Dec. 19, 2005)). It took action.

FERC's remedy to the problem of unequal costs was that entities with low costs would make payments to entities with high costs as necessary to achieve "rough" equalization. More specifically, rough equalization was re-achieved through a "bandwidth remedy." "Pursuant to this remedial measure, each calendar year the production costs of each operating company are calculated and, if necessary, 'payments [are] made by the low cost Operating Company(ies) to the high cost Operating Company(ies) such that, after reflecting the payments and receipts, no Operating Company [has] production costs more than 11 percent above the Entergy System average or more than 11 percent below the Entergy System average.'" *LPSC v. FERC*, 771 F.3d 903, 906 (5th Cir. 2014) (quoting *LPSC v. Entergy Servs., Inc.*, 146 FERC ¶ 61,152 at P 3 (2014) (second bracket added)). These payments are known as rough production cost equalization payments, or "Bandwidth Payments." Once Bandwidth Payments reach an Operating Company, a question arises: what becomes of the money?

Here we reach a jurisdictional watershed. For FERC's jurisdiction over the Bandwidth Payments ends when the funds reach the recipient Operating

No. 17-50042

Companies. State regulators determine the effect Bandwidth Payments will have on retail rates. Or, in FERC's words, states handle "any issues related to the allocation of an individual utility's payments or receipts to retail customers." 127 FERC ¶ 61126, 61548 (May 8, 2009).

Bandwidth Payments do not represent profit. Rather, because the purpose of cost equalization is to ensure reasonable rates, the benefit flows to the customer. Accordingly, an entity that receives a Bandwidth Payment passes it through to its customers. And an Operating Company that makes a Bandwidth Payment saddles its customers with that cost. This is a simple dollar-for-dollar pass-through in the ordinary case, where the Operating Company functions solely within one state and is therefore subject to the jurisdiction of only that state.

While Entergy Gulf States existed, however, both Louisiana and Texas regulators had lawful authority to regulate its Bandwidth Payment receipts. This shared jurisdiction affected only the Bandwidth Payments made in one year—2007, the first year the bandwidth remedy was in place. That was more than a decade ago, but it is where our story really begins.

The 2007 Bandwidth Payments reflected the "2006 test year." In other words, they were calculated based on 2006 data. Entergy Gulf States received a $120.1 million Bandwidth Payment while still in existence astraddle the Texas and Louisiana state lines. Under the system we have already described, both Texas and Louisiana regulators had authority to determine how that payment would affect retail rates in their respective jurisdictions. Thus, each state had to decide what portion of the $120.1 million Bandwidth Payment should be passed through to customers within that state.

After receiving the payment, but before state regulators could act, Entergy Gulf States split into two separate entities divided by the state line— ETI (Texas) and EGSL (Louisiana). This separation was immaterial to the

4

No. 17-50042

division of the original $120.1 million payment because it occurred after Entergy Gulf States *received* that payment.  It solved a problem for future years, but as FERC has since made entirely clear, Texas and Louisiana retained their shared jurisdiction of the $120.1 million payment.  *See* 127 FERC ¶ 61126, 61548 (May 8, 2009).

Louisiana regulators acted first, splitting the $120.1 million by allocating an $80.948 million share to Louisiana and a $30.399 million share to Texas.  Entergy then sought PUCT's adoption of the same division, warning PUCT that FERC would "resolve" the matter if PUCT opted for "a different jurisdictional allocation methodology."[1]  Entergy feared that PUCT would decide Texas customers were entitled to more than a $30.399 million share of the $120.1 million, which would mean that Entergy would have to pass a greater benefit to Texas and Louisiana customers than it actually received.

That is just what happened.  PUCT viewed the split as disproportionally favoring Louisiana customers, found Louisiana's method "not equitable," and instead split the $120.1 million "on the basis of actual production costs," resulting in a $62.37 million share for Louisiana and a $48.977 million share for Texas.[2]  In short, while Bandwidth Payments represent a zero-sum game, Louisiana claimed $80.948 million of Entergy Gulf State's $120.1 million piece of the pie, and Texas claimed $48.977 million—leaving an $18.6 million discrepancy that Entergy had to swallow.

Entergy found this unfair.  As foreshadowed, it took its complaint to FERC in the form of a proposed amendment to the System Agreement—an amendment that would allow FERC to allocate Entergy Gulf State's 2007

---

[1] ETI Compliance Filing, Dkt. No. 35269, pg. 6, *available at* http://perma.cc/Q8BN-LC8C.

[2] Order on ETI Compliance Filing, Dkt. No. 35269, pg. 6, *available at* http://perma.cc/2RLL-QFZK.

No. 17-50042

bandwidth receipts between Louisiana and Texas retail jurisdictions. *See* 127 FERC ¶ 61126, 61546. But there it found an unsympathetic ear. FERC recognized a jurisdictional impediment to granting Entergy relief, ruling that "any issues related to the allocation of an individual utility's payments or receipts to retail customers" were beyond its jurisdiction. *Id.* at 61548. Of course, no jurisdictional problem would exist if PUCT had transgressed any FERC order, but FERC confirmed there was no conflict because PUCT accepted "the Commission's determination of the amount of receipts to be distributed to [Entergy Gulf States] under" the filed rate.[3] *Id.* Ultimately, the inconsistent-treatment problem was a problem of Entergy's own creation:

> The potential for retail regulators to adopt different retail allocations of payments for multi-jurisdictional utilities has always existed, and the Commission has never claimed that a Commission-approved allocation has been violated because two states allocated the receipts differently among their respective retail customers. As has long been recognized, when more than one jurisdiction is involved there is an inherent operating risk that one jurisdiction may allocate on a different basis and the allocations may not mesh perfectly. It is axiomatic that different regulatory bodies are not bound to apply the same ratemaking principles, and therefore, the possibility of such imperfection is inherent in this nation's dual system of retail and wholesale rate regulation. This is a risk that Entergy assumed when it established its operating structure.

*Id.* (footnotes omitted).

---

[3] *See also id.* ("[T]he Texas Commission has accepted the Commission's interstate allocation of bandwidth receipts to [Entergy Gulf States] and merely determined what share of those payments should be allocated to Texas retail customers. The Louisiana Commission acted similarly. Thus, no conflict with the Commission's regulations exists.").

No. 17-50042

Entergy's fight was not over yet. It sued PUCT in federal and state courts. Those suits were resolved by settlement in 2010, with ETI agreeing to let the matter go in return for a PUCT-approved rate increase.[4]

That could have been the end of it, but in Entergy's eyes, the issue was not fully resolved because the bandwidth calculation for the 2006 test year remained in flux as various aspects of the bandwidth formula were litigated and ruled upon, meaning additional payments were necessary to "true-up" the rough equalization of production costs. Accordingly, in 2014, FERC found that its orders since the initial bandwidth calculation "affect the test year 2006 bandwidth calculation." It ordered Entergy "to file a comprehensive bandwidth recalculation report showing the updated payments and receipts" for both that year and 2007 in light of the changes.

Entergy submitted its recalculations in the form of a "compliance filing." TIEC opposed not the calculations but that portion of the compliance filing allocating the additional payment between ETI and EGSL; TIEC thought that the payments should be treated as being made to Entergy Gulf States. In the order now made the subject of this litigation, FERC accepted Entergy's filing and rejected TIEC's objection, finding "it was reasonable for Entergy to recalculate the 2007 bandwidth filing and allocate refunds and surcharges for" ETI and EGSL because those entities had succeeded the now-defunct Entergy Gulf States. 151 FERC ¶ 61112, 61701 (May 14, 2015).

This "2015 FERC Order" also contained the following table, which "summarizes the remaining or true-up amounts to be paid/received on September 24, 2014." *Id.* at 61699.

---

[4] *See* Order on ETI Application for Authority to Change Rates, Dkt. No. 37744, *available at* https://perma.cc/32HU-J55B.

7

No. 17-50042

| Company | Total 2007 bandwidth (payments)/receipts including interest | 2007 bandwidth amounts previously (paid)/received per the May 27, 2007 initial filing | Remaining 2007 bandwidth amounts to be (paid)/received |
|---|---|---|---|
| Entergy Arkansas | ($278.3) | ($251.7) | ($26.5) |
| Entergy Gulf States Louisiana | $108.7 | $89.7 | $19.0 |
| Entergy Louisiana | $93.8 | $91.1 | $2.7 |
| Entergy Mississippi | $34.5 | $40.6 | ($6.1) |
| Entergy New Orleans | $0.0 | $0.0 | $0.0 |
| Entergy Texas | $41.3 | $30.4 | $10.9 |

It is undisputed that the 2015 FERC Order authorized ETI to receive an additional $10.9 million Bandwidth Payment stemming from the 2006 test year. It did that and more, according to ETI. Based upon this table, ETI concluded that FERC had reversed itself with respect to the earlier Texas/Louisiana allocation dispute and retroactively reallocated to ETI a mere $30.4 million share of the original $120.1 million, meaning PUCT had overcharged ETI by more than $18 million.

ETI informed PUCT of this conclusion in late 2014, asserting that, under FERC's order, "retail customers have received from ETI an overpayment of $8.6 million for the 2007 Bandwidth filing." This statement implied ETI would be keeping the new $10.9 million Bandwidth Payment as partial recompense for the prior overpayment. If PUCT cooperated, ETI would be content to let sleeping dogs lie: ETI assured PUCT that, "[i]n the interest of its customers," ETI did not "intend to revisit the over-payment of 2007 receipts" but warned that "if other parties decide to revisit issues related to the overpayment, then ETI will respond accordingly." In short, ETI would litigate if PUCT deemed the $10.9 million payment to be a new Bandwidth Payment subject to ordinary pass-through procedures.

No. 17-50042

PUCT ordered the $10.9 million payment be passed through to customers. ETI sued, seeking to enjoin enforcement of PUCT's order on the basis that it conflicted with the 2015 FERC Order in light of the table set forth above. TIEC intervened and participated in the litigation. The district court found ETI's contentions persuasive and enjoined enforcement of the PUCT order. PUCT and TIEC appealed.

## II.    STANDARD OF REVIEW

Orders granting or denying a permanent injunction are typically reviewed for abuse of discretion. *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916 (5th Cir. 1996). But when the dispute turns on the legal question of preemption, review is *de novo*. *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). The issue facing this court is preemption *vel non*, and review is *de novo*.

## III.    DISCUSSION

This is a single-question case: did the 2015 FERC Order merely identify the proper amount of remaining Bandwidth Payments to be made to various Operating Companies including ETI, or did it also retroactively reallocate all previously made 2007 Bandwidth Payments, thus establishing that PUCT had already ordered ETI to pass through more funds than ever it received in Bandwidth Payments?

### A. The Arguments

PUCT and TIEC argue that the purpose of the 2015 FERC Order was to allocate remaining Bandwidth Payments attributable to the 2006 test year, payments that were now due in light of changes and clarifications to the bandwidth formula. Under this view, ETI was entitled to an additional $10.9 million Bandwidth Payment, which it duly received and which PUCT duly ordered passed through to customers. Any gripes relating to the alleged initial overcharge are water under the bridge because PUCT already won that battle,

9

No. 17-50042

and Entergy's attempt to read the 2015 FERC Order in a way that effectively abrogates past PUCT and FERC rulings amounts to a collateral challenge of those long-final orders.

According to ETI, the 2007 Bandwidth Payments were only "conditionally" approved. In subsequent years, the bandwidth formula changed, and FERC ultimately ordered a backward-looking recalculation and reallocation, which Entergy performed and FERC approved. Thus, with the 2015 FERC Order, FERC conclusively determined that ETI's "total" 2007 Bandwidth Payment was $41.3 million. The new payment of $10.9 million approved in that same order is off limits to PUCT because PUCT has already claimed more than $41.3 million in 2007 Bandwidth Payments. Put another way: PUCT must abide by the determination that ETI received a mere $41.3 million in 2007 Bandwidth Payments, and because it has already passed through 2007 Bandwidth Payments in excess of that figure, it cannot touch the $10.9 million payment.

## B. Relevant Principles

FERC has "exclusive jurisdiction to regulate the transmission and wholesale sale of electric energy in interstate commerce." *AEP Tex. N. Co. v. TIEC*, 473 F.3d 581, 584 (5th Cir. 2006). The Federal Power Act both supplies FERC with this jurisdiction and limits it, establishing "a zone of exclusive state jurisdiction." *Electric Power Supply*, 136 S.Ct. at 767. It is for states to regulate both "within-state wholesale sales" and, "more pertinent here, retail sales of electricity." *Id.* at 768.

There is no overlap of jurisdiction. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 911 F.2d 993, 1001 (5th Cir. 1990). But there is a risk that one regulator acting in its proper capacity can disrupt the regulatory efforts of the other. *See Electric Power Supply*, 136 S.Ct. at 776. In cases of conflict, the Constitution's Supremacy Clause controls. *See Entergy*

10

No. 17-50042

*Louisiana Inc.*, 539 U.S. at 47, 123 S.Ct. at 2056. "The filed rate doctrine requires 'that interstate power rates filed with FERC or fixed by FERC must be given binding effect by state utility commissions determining intrastate rates.'" *Id.* (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962, 106 S.Ct. 2349, 2354 (1986)). Thus, as applied to state regulators, the filed rate doctrine polices the jurisdictional line and protects FERC's authority. *Id.*

## C. Interpreting the 2015 FERC Order

When interpreting an order, we start with the order. What does it say? What, on its face, does it do? ETI seeks to convince us that FERC's order retroactively reallocates 2007 Bandwidth Payments, but the order simply says nothing about that. The word "reallocation" is not used; nor is any synonym or functionally equivalent phrasing. There are no broad statements from which an objective reader can infer any intent to retroactively reallocate the 2007 Bandwidth Payments. And there are no statements shedding light on a supposed need or motivation to do so. ETI's position looks suspect already.

FERC was specific about what its order does. Most basically, the order approves ETI's compliance filing. 151 FERC ¶ 61112, 61698 ("Entergy's compliance filing is accepted."). Indeed, assessing the acceptability of the compliance filing was the order's *raison d'être*. This observation raises two question. First, with its filing, what did FERC order with respect to Entergy's compliance filing? (If FERC had previously ordered a retroactive reallocation, then we have our answer.) Second, did Entergy's compliance filing itself purport to effect a retroactive reallocation? (If so, FERC's acceptance of the filing would likely establish a retroactive reallocation, even if FERC had not previously contemplated such a measure.) If the answers to these questions do not point to a retroactive reallocation, then ETI is left with the difficult task

Case: 17-50042    Document: 00514503814    Page: 12    Date Filed: 06/07/2018
Case 1:16-cv-00277-RP    Document 31    Filed 06/07/18    Page 14 of 36

No. 17-50042

of persuading us that the 2015 FERC Order somehow effectuated a retroactive reallocation by the way.

### 1. FERC's orders requiring the Entergy compliance filing did not call for a retroactive reallocation of 2007 Bandwidth Payments.

As noted already, the bandwidth formula remained in flux for years after the 2007 Bandwidth Payment had been made, meaning the initial payment had necessarily been calculated incorrectly. Once FERC got the formula ironed out, it became clear that two Entergy Operating Companies needed to make further payments to achieve rough cost equalization. FERC ordered Entergy to submit a single filing that would "comply with" its "final orders regarding the annual bandwidth calculations pending in numerous dockets." 148 FERC ¶ 61085, 61514 (July 31, 2014). The formal directive was:

> to file, within 45 days of this order, a comprehensive bandwidth recalculation report showing the updated payments and receipts based on the 2006 and 2007 calendar year data in compliance with all bandwidth formula and bandwidth calculation adjustments that the Commission accepted or ordered, effective as of June 1, 2007 and June 1, 2008, respectively, along with supporting calculations for each identified adjustment.

*Id.* at 61514.

In its briefing, ETI points us to the words "comprehensive" and "recalculation." But those words don't help its cause. FERC required a *comprehensive* compliance filing because it was allowing Entergy to comply with several orders in one submission. And FERC required a *recalculation* because a *re*calculation was patently necessary in light of its rulings that changes to the bandwidth formula impacted the original calculations. FERC did not order Entergy to submit a compliance filing retroactively reallocating

No. 17-50042

the 2007 Bandwidth Payments, and its subsequent acceptance of the compliance filing did not perforce achieve such an outcome.[5]

ETI's reading of the procedural history is different. ETI places great importance on an alleged 2007 FERC statement that the initial Bandwidth Payments were approved "expressly subject to revision and refund." From this, ETI contends that the initial calculation was subject to a complete do-over, which occurred in 2015. Even if ETI accurately described FERC's 2007 statement, use of the word "revision" would be a thin reed upon which to hang its reallocation arguments. But in fact FERC never said that its initial allocation decision was subject to *revision and* refund, which explains ETI's telling failure to quote the cited FERC order. Rather, FERC stated that its initial decision was simply "subject to refund." 120 FERC ¶ 61094, 61536. ETI's attempt to rewrite the FERC order speaks volumes, and there is no textual support for its assertion that the initial determination was effectively tentative. FERC's actual 2007 phrasing favors PUCT and TIEC, who are arguing that the 2015 FERC Order resolved only the issue of "refunds and surcharges." The process they describe—an initial payment followed by a true-up years later—is consistent with FERC's original approval "subject to refund." 120 FERC ¶ 61094, 61536.

We have located only one FERC statement that favors ETI. In the July 31, 2014 order already discussed, FERC said that "now is the appropriate time for Entergy to recalculate and *reallocate* the bandwidth payments and receipts among the Operating Companies." 148 FERC ¶ 61085, 61514 (emphasis added). Here we have the word *reallocate*, but its use does not necessarily

---

[5] To illustrate, in another FERC order accepting an Entergy compliance filing, FERC stated that the filing contained a "comprehensive bandwidth recalculation report showing the payment/receipt amounts based on 2009 test year data, including all workpapers." 156 FERC ¶ 61195 (Sept. 22, 2016). This language is nearly identical to the language used in the 2015 FERC Order. It is not indicative of an extraordinary retroactive reallocation.

No. 17-50042

indicate an intent that Entergy conduct a retroactive reallocation as opposed to a supplemental true-up process with no retroactive effect. Both processes could be said to involve a reallocation. In any event, FERC used the word only in passing. When it came time to issue a specific directive, the word is conspicuously absent. FERC's detailed formal instruction—quoted above—does not include a mandate to "reallocate" payments and receipts. *See id.*

### 2. Entergy's compliance filing did not contain a retroactive reallocation that FERC approved in the 2015 FERC Order.

Given that FERC accepted Entergy's compliance filing, then (notwithstanding its instructions regarding the scope of that filing) perhaps ETI would prevail if its compliance filing included a retroactive reallocation. The compliance filing did no such thing. FERC itself described the substance of the relevant document: "Entergy's compliance filing consists of the recalculation *of the true-up payments and receipts based on 2006 test year data* and supporting workpapers for each identified adjustment, along with the applicable interest calculation through September 24, 2014, the date the payments and receipts will be made among the Entergy Operating Companies." 151 FERC ¶ 61112, 61698 (emphasis added). This description is inconsistent with Entergy's claim that its filing "consisted of the recalculation *and reallocation of*" 2007 Bandwidth Payments.[6] But it corresponds with the account put forth by PUCT and TIEC.

Our examination of Entergy's compliance filing likewise fails to unearth a hidden retroactive reallocation of 2007 Bandwidth Payments.[7]     The

---

[6] The phrase "recalculation and reallocation" occurs at least five times in ETI's brief. But Entergy never used the phrase prior to this litigation.

[7] ETI makes much of the fact that neither TIEC nor any other party "protested the bandwidth formula recalculation amounts." But if this lack of protest is relevant, it only demonstrates that no party even conceived of the possibility that Entergy's bandwidth compliance filing included a retroactive reallocation of already-litigated-and-paid 2007 Bandwidth Payments. Similarly, the fact that neither PUCT nor TIEC challenged the 2015

No. 17-50042

compliance filing describes itself as a mere "bandwidth recalculation report" or "recalculation report."[8]    The bulk of the filing is a series of substantive explanations.    Thus, headings "A" through "H" describe various accounting methods and decisions in a high level of detail.    Despite this granular explanation, the compliance filing nowhere mentions any sort of retroactive reallocation.

If the filing did contain a retroactive reallocation, it would presumably be found in Section III of the document, titled "Comprehensive Calculation of the Bandwidth Payments and Receipts."  This section is the original source of the table that later appeared in the 2015 FERC Order.  According to Entergy's compliance filing, the table does not represent a retroactive reallocation of 2007 Bandwidth Payments and instead simply summarizes "remaining or true-up amounts" to be allocated in light of the recalculation.  In this section of the filing, Entergy also explains that Entergy Gulf States' share is being "allocate[d]" between ETI and EGSL according to a predetermined method. But, again, no mention of reallocation.  Having reviewed Entergy's filing, we conclude that FERC's acceptance of the document did not necessarily effectuate a retroactive reallocation of 2007 Bandwidth Payments.

### 3. The 2015 FERC Order does not retroactively reallocate 2007 Bandwidth Payments

FERC Order only lends credence to their present contention that the order is copacetic and that PUCT's order adheres.  ETI's characterization of the PUCT order as "an improper collateral attack on FERC's final decision" is not sensible.

[8] Indeed FERC's characterization of the compliance filing comes from the filing itself, which states: "The instant compliance filing consists of the recalculation of the true-up payments and receipts based on 2006 test year data and supporting workpapers for each identified adjustment, along with the applicable interest calculation through September 24, 2014."  Compare that description with the description ETI now provides on appeal: "Entergy's filing consisted of the recalculation *and reallocation* of the Bandwidth payments and receipts based on 2006 test period cost data and supporting workpapers for each identified adjustment, along with the applicable interest calculation from June 1, 2007 through September 24, 2014." (Emphasis added.)   Entergy's pre-litigation description is helpful, and in its own way, so is the tell-tale revision on appeal.

No. 17-50042

Here is what we know so far: FERC did not ask for a compliance filing that performed a retroactive reallocation of the 2007 Bandwidth Payments, and the compliance filing FERC approved contained no such reallocation. ETI cannot point to any clear FERC statement imposing a retroactive reallocation, and the measure is not necessary to achieve FERC's goal of roughly equalizing the Operating Companies' productions costs on a prospective basis. *See* 137 FERC ¶ 61029 P.157 (explaining that Bandwidth Payments "occur prospectively"). Lastly, Entergy did not ask for a retroactive reallocation, and no party made it an issue before FERC.

Nonetheless, ETI says the retroactive reallocation is there on the face of the order. For this proposition, ETI relies almost entirely on the order's inclusion of the table listing $41.3 million as the "Total 2007 bandwidth (payments)/receipts including interest." *Here* we have the retroactive reallocation of the 2007 Bandwidth Payments, or so says ETI. We now consider that claim.

As already seen, Entergy created the table, and FERC reproduced it in the 2015 FERC Order. The table does list $41.3 million as the "Total 2007 bandwidth (payments)/receipts including interest." But this table was not created in a vacuum and cannot be interpreted in a vacuum. In light of the context already provided, we will not hastily conclude that Entergy hid a dramatic retroactive reallocation in plain sight, nor that FERC blessed it.

What *is* this table and what does each column represent? In its order, FERC described the table as a summary of "the remaining or true-up amounts to be paid/received on September 24, 2014." If that is what this table is, then only its third column is operative, for that is the column that documents the "Remaining 2007 bandwidth amounts to be (paid)/received." Under this reading, the district court was correct in dubbing the middle column "merely an accounting assumption," and it erred by failing to recognize that the

16

No. 17-50042

adjacent column also contained a mere accounting assumption. The last column is substantive; the other columns show the math.

There is nothing strange about using hypothetical inputs to determine ETI and EGSL's share of the *remaining* Bandwidth Payments seeing as how they did not exist in 2007 to receive the *initial* Bandwidth Payments. Because neither ETI nor EGSL actually received a 2007 Bandwidth Payment, FERC had to assign them a hypothetical share of the original $120.1 million payment to determine what portion of the remaining true-up each should receive. This does not mean there was some sort of retroactive reallocation with consequences far outreaching FERC's objective or Entergy's compliance task.

We are satisfied that the table does not call for a retroactive reallocation of 2007 Bandwidth Payments. Indeed, this entire dispute ultimately boils down to whether the table is a summary of "the remaining or true-up amounts to be paid/received on September 24, 2014," or whether it is instead a summary of "the comprehensive recalculation/reallocation of 2007 Bandwidth Payments and remaining or true-up amounts to be paid/received on September 24, 2014." On its face, the FERC order declares that it is the former.

Other textual clues abound. The 2015 FERC Order recounts that Entergy first calculated "the incremental 2006 bandwidth receipts due" and then allocated Entergy Gulf State's share between ETI and EGSL. 151 FERC ¶ 61112, 61699. And the order distinguishes between "original bandwidth payments and receipts" *previously* at issue and the associated "refunds and surcharges" *presently* at issue. *Id.* at ¶ 61701 ("[W]hile the original bandwidth payments and receipts in 2007 for the 2006 test year involved Entergy Gulf States, . . . any refunds and surcharges associated with the 2007 bandwidth payments and receipts now must reflect the current members of the System Agreement . . . ."). Thus, the order does not resolve issues relating to the "original bandwidth payments" and merely addresses remaining "refunds and

No. 17-50042

surcharges," which it "allocate[s]." *Id.* These features conform precisely to PUCT's and TIEC's shared interpretation.

ETI's textual quiver has but one remaining arrow. It, too, misses the mark. ETI contends that the 2015 FERC Order must represent a "redo" of the 2007 Bandwidth Payments because the accepted compliance filing was to be deemed "effective as of June 1, 2007." The June 1, 2007 effective date is no more consistent with a retroactive reallocation than it is with an allocation of true-up payments. Here, the effective date was used to calculate interest. *See id.* at 61698 (noting that FERC's order requiring the compliance filing "directed that interest be included with the bandwidth payments/receipts made pursuant to the comprehensive recalculation from June 1, 2007"). It does not establish a retroactive reallocation of past receipts.

In summation, our review of the 2015 FERC Order and its underlying orders and filings persuades us that its effect was merely to distribute true-up Bandwidth Payments among the Operating Companies entitled to receive them.[9] There was no retroactive reallocation of past Bandwidth Payments.

### D. PUCT's Order Is Consistent with the 2015 FERC Order

In the ordinary course an Operating Company receiving a Bandwidth Payment passes the benefit through to customers, thus ensuring reasonable, nondiscriminatory rates. And so it was here. The 2015 FERC Order entitled ETI to an additional $10.9 million Bandwidth Payment for the 2006 test year. PUCT's straightforward reading of the order was that the Bandwidth Payment was an "incremental" or further payment that had to be passed along to customers. We affirm the rightness of this reading today.

---

[9] PUCT has additional arguments—an argument invoking the presumption against preemption and an argument premised on stipulations ETI entered into when settling its lawsuits against PUCT in 2009. We do not need to reach these arguments to render our decision, and so we do not address them.

18

No. 17-50042

In 2009, FERC recognized that PUCT's pass-through order properly "accept[ed] the Commission's determination of the amount of receipts to be distributed to" Entergy Gulf States under the filed rate. 127 FERC ¶ 61126, 61548. The same is true of the order we review today. PUCT has accepted FERC's determination of the amount of receipts to be distributed to ETI under the filed rate. It had authority to order that same sum passed along to customers pursuant to routine procedure. There is no conflict.

## IV.   CONCLUSION

The PUCT order is not inconsistent with the FERC Order and is not preempted. Rather, it is enforceable. The district court's contrary judgment is REVERSED. All we have said disposes of this case entirely and judgment is therefore RENDERED in favor of the defendants.

No. 17-50042

PRISCILLA R. OWEN, Circuit Judge dissenting:

I would affirm the district court's judgment. I therefore respectfully dissent.

First, the panel's majority opinion fails to recognize that the payment of $120.1 million that Entergy Gulf States, Inc. (Gulf States) received in 2007 from affiliated companies referable to 2006 wholesale production costs was permitted to go into effect by the Federal Energy Regulatory Commission (FERC) only *conditionally*. When the FERC conditionally approved this payment, it ordered a full hearing as to what the FERC tariff, which governed the allocation of wholesale costs among the Entergy affiliates, required.[1] The conditional authorization of the $120.1 million payment to Gulf States was not a final determination that Gulf States, as a utility that served customers in more than one state, would ultimately be the entity to whom payments under the FERC tariff were owed for 2006, nor was it a final determination as to the amounts that should be allocated among the Entergy affiliates under the FERC tariff. Therefore, even though the Public Utility Commission of Texas (PUCT) required the pass through of payments set forth in FERC's conditional approval in 2007, that pass through was only of wholesale production costs approved on a conditional basis, subject to change by the FERC, and therefore potentially subject to recoupment. After protracted proceedings spanning years, the FERC held that Gulf States had ceased to exist by the time final determinations were made regarding the allocation of wholesale production costs among Entergy entities. The FERC concluded that the FERC tariff

---

[1] *Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,094 (2007).

No. 17-50042

governed to whom payments among the Entergy affiliates would be allocated for 2006 production costs and the final amount of those payments.[2]

Second and relatedly, the outcome of this case should be resolved by at least two decisions of the FERC that are final and binding on the parties to this proceeding. The first issued on October 2, 2011,[3] and the second on May 14, 2015.[4] In each, the FERC held that as a *jurisdictional matter*, when Gulf States ceased to exist, two new entities that each served only one jurisdiction (that is, only one state) succeeded Gulf States under the FERC tariff.[5] That meant that state regulators could not allocate wholesale costs incurred by either of these entities between two different jurisdictions (states). Therefore, the wholesale costs attributable to each of the new entities, as finally determined by FERC in 2015, were recoverable in total, through state rates.[6] The FERC held that even though Gulf States was still in existence and still providing services to two jurisdictions (Texas and Louisiana) throughout 2006 and 2007, the creation of the two new companies changed the analysis of how to allocate wholesale production costs for those years, because the two new entities became the parties to the tariff instead of Gulf States, and it was the tariff, not "historical facts" that governed to whom broadband remedy payments were to be allocated.[7] Under the FERC tariff setting forth the bandwidth remedy, the payments were to be allocated once the FERC resolved

---

[2] *Entergy Servs., Inc.*, 151 F.E.R.C. ¶ 61,112 (2015).

[3] *Entergy Servs., Inc.*, 137 F.E.R.C. ¶ 61,029 (2011).

[4] 151 F.E.R.C. ¶ 61,112.

[5] *See* 137 F.E.R.C. ¶ 61,029 at PP 154-55; 151 F.E.R.C. ¶ 61,112 at P 16.

[6] *See Nantahala Power & Lighting Co. v. Thornburg*, 476 U.S. 953, 970 (1986) ("The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate.").

[7] *See* 137 F.E.R.C. ¶ 61,029 at PP 154-59.

No. 17-50042

what the final amounts were to be, which was after December 31, 2007, when Gulf States ceased to exist. The FERC held that, with regard to the calendar year 2007 production costs, "[t]he split requires that the bandwidth remedy payments be allocated among the two successor Operating Companies, not between two retail jurisdictions."[8]  The FERC specifically referenced and adopted the same reasoning as to the 2006 calendar year.[9]  None of the parties to this suit challenged the FERC's orders, and they are final and binding even if the FERC ruled incorrectly regarding its jurisdiction to allocate payments to the new Entergy entities, rather than Gulf States. The FERC unequivocally held that is was allocating wholesale costs among affiliates that each served only one state. It was not allocating costs incurred by the now-dissolved Gulf States.

The final FERC order regarding the Entergy entities' 2006 costs establishes the wholesale rates that Entergy Texas may recover under the applicable FERC tariff. Entergy Texas is entitled, as a matter of federal law, to recover the full amount of the wholesale costs allocated to it. The FERC determined that Entergy Texas was entitled to a total bandwidth remedy payment for 2006 wholesale costs of $41.3 million, which was the sum of $30.4 in bandwidth remedy payments from affiliates in 2007, and an additional $10.9 million that FERC found in 2015 was due from affiliates. As a matter of federal law, Texas Entergy was only required to pass through a total of $41.3 million in bandwidth remedy payments to Texas ratepayers. The PUCT had previously required it to pass through $57.733 million in bandwidth remedy payments. The difference is $16.033 million—$57.733 million (the amount already passed through) minus $41.3 million (the most that the PUCT could

---

[8] *Id.* at P 154.
[9] 151 F.E.R.C. ¶ 61,112 at P 15-19.

No. 17-50042

require Entergy Texas to pass through), which equals a $16.033 million under-recovery of wholesale costs by Entergy Texas for 2006.  The PUCT cannot require Entergy Texas to pass through the $10.9 million payment as a bandwidth remedy that is at issue in this appeal.

## I

Entergy Services, Inc. (Entergy), a utility holding company, made a bandwidth remedy filing regarding its affiliates' wholesale production costs for the 2006 calendar year.  At time of that filing, Gulf States was still in existence and served both Texas and Louisiana.  The FERC described this filing as "rates pursuant to Service Schedule MSS-3 of the Entergy System Agreement (System Agreement) implementing the Commission's decisions in Opinion Nos. 480 and 480-A."[10]  The FERC conditionally approved these rates in a June 2007 order.[11]  That order reflected that Gulf States would receive a payment of $120.1 million from other of the Entergy Operating Companies.  However, it was clear from that order that these rates could, and in all likelihood would, be subject to revision:

> 18. Entergy's proposed rates raise issues of material fact that cannot be resolved based on the record before us.  These issues of material fact are more appropriately addressed in the hearing procedures and settlement judge procedures ordered below.

> 19. Our preliminary analysis indicates that Entergy's proposed rate schedule has not been shown to be just and reasonable and may be unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful. Therefore, we will accept Entergy's proposed rates for filing, suspend it for a nominal period, make it effective June 1, 2007, as requested, subject to refund, and set it for hearing and settlement judge procedures.[12]

---

[10] *Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,094 (2007).

[11] *Id.*

[12] *Id.* at PP 18-19.

No. 17-50042

The proceedings regarding the 2006 calendar year wholesale production costs and the bandwidth remedy spanned several years and resulted in numerous FERC orders and decisions.[13]

Long before the FERC proceedings reached a final conclusion as to the justness and reasonableness of the $120.1 million amount conditionally approved in 2007, the PUCT allocated the $120.1 million as between the service provided by Gulf States in Texas and the service it provided in Louisiana differently than the Louisiana Public Service Commission (Louisiana Commission) allocated the same $120.1 million. The PUCT ordered that Gulf States pass through $48.977 million to Texas retail customers and $8.756 million to Texas wholesale customers, for a total of $57.733 million. The Louisiana Commission ordered Gulf States to pass through $80.948 million to Louisiana customers. Therefore, Gulf States passed through $18.581 million more than the $120.1 million conditional payment that was made by Entergy affiliates pursuant to the FERC's June 26, 2007 order.

Entergy sought to remedy this by proposing to the FERC that it be permitted to amend the Entergy System Agreement.[14] The FERC denied that request, concluding that because Gulf States served both Texas and Louisiana, "[t]he potential for retail regulators to adopt different retail allocations of payments for multi-jurisdictional utilities has always existed," and "[t]his is a risk that Entergy assumed when it established its operating structure."[15]

On January 1, 2008, Gulf States ceased to exist as an entity. Entergy Texas, Inc. and Entergy Gulf States Louisiana, Inc. (Entergy Gulf States

---

[13] *See* 151 F.E.R.C. ¶ 61,112 at n. 1-27.

[14] *Entergy Servs., Inc.*, 127 F.E.R.C. ¶ 61,126 (2009).

[15] *Id.* at P 25.

No. 17-50042

Louisiana) were formed. [16]  Entergy Texas serves only Texas, and Entergy Gulf
States Louisiana serves only Louisiana. [17]

Subsequently, Entergy filed with the FERC its proposed allocation of
wholesale production costs among its affiliates for the calendar year 2007. [18]
Entergy proposed, and the FERC approved, an allocation of production costs
to Entergy Texas, with no costs allocated to the now-dissolved Gulf States. [19]
But the FERC did so only after a lengthy consideration of jurisdictional issues
raised by the Louisiana Commission and a thorough discussion of the
proceedings in which it had denied Entergy's request to amend the Entergy
System Agreement that Entergy has proposed as a result of the PUCT's and
Louisiana Commission's differing treatment of the conditional $120.1 million
bandwidth payment. [20]

The Louisiana Commission and others argued that because Gulf States
was the entity that operated throughout 2007 and served both Texas and
Louisiana, broadband remedy payments owed by other Entergy affiliates that
were referable to 2007 wholesale costs must be allocated to Gulf States, and
therefore subject to reallocation by the Louisiana Commission (and the PUCT)
at the intrastate level. [21]  In rejecting this argument, the FERC explained that
it had denied the proposed amendments to the Entergy System Agreement
because that proceeding involved "an allocation of the bandwidth entitlement
of a single Operating Company, Entergy Gulf States, between two retail

---

[16] *Entergy Servs., Inc.*, 137 F.E.R.C. ¶ 61,029 at P 121 (2011).
[17] *Id.*
[18] *Id.* at PP 123-125.
[19] *Id.* at P 189.
[20] *Id.* at PP 126-189.
[21] *Id.* at P 154 ("[T]he Louisiana Commission and Industrial Consumers argue that
the [FERC] rejected in earlier proceedings Entergy's argument that the [FERC] has
jurisdiction to determine the share of the bandwidth receipts allocated to Entergy Gulf States
and then allocated to its Louisiana and Texas retail customers.").

No. 17-50042

jurisdictions in which it operated."[22]   The FERC reasoned that "Entergy Gulf States split into two successor Operating Companies, Entergy Gulf States Louisiana and Entergy Texas."[23]   That "split requires that the bandwidth remedy payments be allocated among the two successor Operating Companies, not between two retail jurisdictions.  This issue does not deal with an allocation to any retail jurisdiction.  Instead, it involves the rough equalization of production costs among Entergy Operating Companies."[24]   The FERC made clear that because each of the two new Entergy entities served only a single retail jurisdiction (a single state), there was no allocation for the state regulatory commissions to resolve:

> 155. Entergy Gulf States ceased to exist on December 31, 2007 and its two successor companies—Entergy Gulf States Louisiana and Entergy Texas—are Operating Companies in 2008 as provided in Service Schedule MSS-3.  It is the [FERC] that has the jurisdiction to determine the rough production cost equalization under Service Schedule MSS-3 among all of the Operating Companies, including Entergy Gulf States Louisiana and Entergy Texas.

> 156. The Presiding Judge properly recognized that the [Federal Power Act] and [FERC] precedent specific to the Entergy System Agreement give the [FERC] jurisdiction over the Entergy System Agreement.  The Presiding Judge explained, and Entergy and Trial Staff emphasized in their Briefs Opposing Exceptions, that the [FERC] is "the only entity that can review the justness and reasonableness of charges under the Entergy System Agreement."[25]

The FERC expressly recognized that this allocation may have an impact on state retail rates but explained that the tariff required allocation based on the entity that was subject to the Entergy System Agreement and rate tariffs

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.* at PP 155-56.

No. 17-50042

at the time that FERC's allocation was made, not based on the entity that was in existence at the time that the costs were actually incurred. To minimize the risk of characterizing the FERC's reasoning inaccurately, I quote the FERC order at length:

> 157. First, we agree with the Presiding Judge that payments and receipts, while based on costs for 2007, occur prospectively in 2008. While Entergy Gulf States Louisiana and Entergy Texas were not in existence in 2007, the Presiding Judge recognized that it was only logical to place them into Entergy Gulf States' position in order to ensure rough production cost equalization among the Operating Companies. He emphasized, and we agree, that while this allocation may have an impact on retail rates (much like virtually every other Commission decision), the determination being made is not a retail allocation; it is an allocation, made pursuant to the System Agreement, between Operating Companies.
>
> 158. Moreover, we agree with Entergy that Industrial Consumers misinterpret the bandwidth formula by construing the term "Receiving Company" in Service Schedule MSS-3 as being qualified by reference to companies that were in existence during the historical test year used in the bandwidth calculation. Industrial Consumers claims that neither Entergy Texas nor Entergy Gulf States Louisiana can logically be classified as a "Receiving Company," which is defined in Service Schedule MSS-3 as "a Company or Companies with a positive Disparity." Industrial Consumers argues that it is illogical to interpret this term to include a company for which no disparity could be calculated under the tariff. However, as Entergy points out, the term "Company" is defined in the System Agreement to include, for calendar year 2008, Entergy Gulf States Louisiana and Entergy Texas. As of June 1, 2008, the date of the commencement of bandwidth payments under the bandwidth formula, Entergy Gulf States Louisiana and Entergy Texas each were a "Company" under the Entergy System Agreement. Therefore, they are each a "Company" eligible for bandwidth payments as provided for by the bandwidth formula contained in Service Schedule MSS-3, and that defined term cannot be given a different meaning simply because a formula rate is populated with data from a historical test year.

No. 17-50042

While this is consistent with Service Schedule MSS-3, it does, as Entergy recognizes, create an implementation issue requiring a division and assignment of historical costs. However, this fact does not mean that the filed rate (the formula) has been changed in any manner. Further, the determination of how to populate the formula rate under the circumstances presented does not deprive this Commission of jurisdiction. To the contrary, the creation of Entergy Texas and Entergy Gulf States Louisiana requires, as a matter of law, that the Commission decide how to apply a wholesale rate schedule to the facts presented.

159. Industrial Consumers' argument to the contrary is based on the erroneous presumption that the tariff is applied on an historical basis. It asserts that its position is correct because the 2008 bandwidth payments are "remedial payments to settle production cost disparities from 2007." However, while the Commission has characterized the bandwidth payments as "remedial payments," the Commission has made clear that the remedy is prospective in nature:

> The bandwidth remedy does not involve refunds. Rather, as Entergy explains, the bandwidth remedy payments made under Section 30.09(d) bring the Operating Companies within the Opinion No. 480 bandwidth on a prospective basis.

160. Accordingly, allowing Entergy Texas and Entergy Gulf States Louisiana to take the place of Entergy Gulf States' position as Receiving Companies, while using Entergy Gulf States production costs in the calculation of bandwidth payments and receipts is a reasonable way to address this unique problem with the bandwidth formula.

161. As the Presiding Judge points out, "in order to roughly equalize costs among the Operating Companies in existence in 2008, Entergy Gulf States' 2007 production costs must be used in the bandwidth formula." Entergy Gulf States Louisiana and Entergy Texas are the successors of Entergy Gulf States. Allowing the two companies to step into the shoes of Entergy Gulf States for purposes of application of Service Schedule MSS-3 is a reasonable way to roughly equalize production costs for the 2007 calendar

No. 17-50042

year.   We agree with Trial Staff that Industrial Consumers'
argument, which would prevent Entergy Texas and Entergy Gulf
States Louisiana from being considered Receiving Companies, is
at best an overly restrictive interpretation of Service Schedule
MSS-3's provisions.   We find that the Presiding Judge's
interpretation of Service Schedule MSS-3 is a reasonable
interpretation under the unique circumstances at hand.[26]

Though these determinations were made with respect to the wholesale
production costs of Entergy affiliates for the calendar year 2007, and the only
year at issue in this appeal is 2006, it is important to understand the FERC's
rulings because they were cited and applied regarding the 2006 cost
allocations.[27]  The final resolution of the 2007 costs occurred, in FERC Opinion
No. 514, before the resolution of the 2006 cost allocations.

Years after the initial filing in 2007 that set forth the proposed
allocations among Entergy affiliates for 2006, including the $120.1 million
payment to Gulf States, the FERC required Entergy to file "a comprehensive
bandwidth recalculation report," and Entergy complied on September 15,
2014.[28]  The FERC approved the allocations proposed by Entergy, and they
differed from the conditional allocations that had been allowed to go into effect
in 2007.[29]  Importantly for the purposes of this appeal, there is no allocation,
at all, for Gulf States in the allocations the FERC finally approved in 2015 for
the calendar year 2006.[30]  Instead, there are only allocations for Entergy Texas
and Entergy Gulf States Louisiana.[31]  As discussed above, the FERC had
previously approved, with respect to the 2007 calendar year, a methodology to

---

[26] *Id.* at PP 157-61.
[27] *Entergy Servs., Inc.*, 151 F.E.R.C. ¶ 61,112 at P 16-18.
[28] *Id.* at P 1.
[29] *See id.* at PP 15-19.
[30] *Id.* at PP 4-6.
[31] *Id.*

No. 17-50042

apportion production costs between Entergy Texas and Entergy Gulf States
Louisiana after the "jurisdictional separation of Entergy Gulf States into"
those two entities.[32]

The FERC's order reflects that in 2007, Entergy Texas had received
bandwidth payments in the amount of $30.4 million for calendar year 2006
costs, and Entergy Gulf States Louisiana had received $89.7 million.[33] The
total of those amounts is $120.1 million, the amount conditionally approved for
payment in 2007 to Gulf States.[34] In 2015, the FERC expressly approved
allocations to Entergy Texas and Entergy Gulf States Louisiana, rather than
Gulf States, with respect to the payments in 2007, and the FERC approved an
additional amount found to be due to each of these entities in the 2015
proceeding. A group called Texas Consumers objected, arguing that "the
[FERC] has previously rejected Entergy's requests to modify the Entergy
System Agreement so that bandwidth receipts owed to [Gulf States] could be
allocated between [Gulf States'] retail jurisdictions," and Texas Consumers
"contended that that is exactly what Entergy's bandwidth recalculations
attempts to accomplish."[35] The FERC was unmoved. It recounted its
determinations in Opinion No. 514, which decided the allocations among
Entergy affiliates for the calendar year 2007, as discussed above.[36] The FERC
explained with regard to its order denying Entergy's request to amend the
Entergy System Agreement that the circumstances were now different:

> Texas Consumers also contends that its theory is supported by a
> [FERC] order in which the [FERC] determined that it did not have
> jurisdiction to address the allocation of an individual utility's
> bandwidth receipts among the utility's retail jurisdictions.

---

[32] *Entergy Servs., Inc.*, 137 F.E.R.C. ¶ 61,029 at P 123 (2011).

[33] 151 F.E.R.C. ¶ 61,112 at P6.

[34] *Entergy Servs., Inc.*, 120 F.E.R.C. ¶ 61,094 at P 7 (2007).

[35] 151 F.E.R.C. ¶ 61,112 at P 10.

[36] *Id.* at P 16.

No. 17-50042

> However, the circumstances that existed in that case—Entergy
> Gulf States was still in existence and the Texas Commission and
> the Louisiana Commission adopted different methods to allocate
> payments between the respective retail jurisdictions—no longer
> exist. Entergy Gulf States has ceased to exist and is no longer able
> to receive bandwidth payments.[37]

In sum, the allocations of costs for the calendar year 2006 that FERC had allowed to go into effect in 2007 were conditional because they were subject to the outcome of future hearings, and FERC made no findings in 2007 that the allocations were just and reasonable or conformed to the applicable tariff. Gulf States was no longer in existence when, in 2015, the FERC approved allocations among the Entergy affiliates for the 2006 costs. Since no allocation could be made under the FERC tariff to Gulf States, FERC allocated the bandwidth payments for the 2006 calendar year to Entergy Texas and Entergy Gulf States Louisiana, in accordance with the governing tariff.

Entergy Texas serves only Texas customers, and it is entitled to recover the 2006 wholesale productions costs allocated to it by passing those costs through in state rates. Entergy Texas has not yet recovered the full amount of those costs, because the PUCT required it to pass through $57.733 million that the PUCT attributed to bandwidth remedy payments. However, the FERC allocated to Entergy Texas only $41.3 million in bandwidth remedy payments, which is comprised of the $10.9 million that FERC ordered Entergy affiliates to pay to Entergy Texas in 2015 and the initial $30.4 million paid in 2007, that was allocated to Entergy Texas rather than Gulf States. The district court did not err in concluding that the PUCT's order requiring Entergy Texas to pass through the $10.9 million to Texas ratepayers conflicted with the FERC's orders.

---

[37] *Id.* at P 19.

No. 17-50042

## II

The PUCT contends that Entergy Texas entered into a rate settlement agreement and accepted a higher rate in PUCT Docket No. 35269, in exchange for abandoning its then-pending appeals that included an appeal of the allocation of the 2007, $120.1 million bandwidth payment to Gulf States. That rate settlement does not affect the issues in this appeal.

Texas rate proceedings involve two rate components, base rates and a fixed fuel factor rate. The fuel factor is periodically reconciled such that actual, eligible fuel costs are trued-up to fuel factor revenues collected. The fuel-factor true-up is then refunded or surcharged to customers.[38] The proceeding in Docket No. 35269 involved a base rate increase, which does not include fuel costs, and an application to reconcile fuel costs on an historical basis. The order in Docket No. 35269 reflects that the 2007 bandwidth payments were treated as fuel costs, and an order in Docket No. 37744 addressed the 2007 bandwidth payments as part of the fuel reconciliation portion of that proceeding. When Entergy Texas abandoned its appeal of the PUCT's allocation of the $120.1 million between Texas and Louisiana, that left the allocation order in Docket No. 35269 intact, which meant only that the PUC had made an allocation of wholesale costs that were recovered by Gulf States on a conditional basis. If the FERC had subsequently ordered, for example, that Texas Entergy actually owed bandwidth payments to one or more of its affiliates for 2006, then the PUCT would have had to reallocate, and permit Entergy Texas to recover from Texas ratepayers the bandwidth payments that Entergy Texas made. The rate settlement in Docket No. 35269 did not require Entergy Texas to forego any rights it might have if, in the future, the FERC

---

[38] *See* TEX. ADMIN. CODE §§ 25.235-25.237.

No. 17-50042

approved bandwidth payments that differed from the conditional 2007 bandwidth payments.

* * * * *

Because the district court's judgment should be affirmed, rather than reversed, I dissent.

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

June 07, 2018

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

        No. 17-50042    Entergy Texas, Incorporated v. Donna Nelson,
                        et al
                        USDC No. 1:16-CV-277

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        *Sabrina B. Short*

                        By: _____
                        Sabrina B. Short, Deputy Clerk
                        504-310-7817

cc:
        Mr. Jay Breedveld
        Mr. John Richard Hulme
        Mr. Jason R. LaFond
        Ms. Marnie A. McCormick
        Mr. Michael Andrew McMillin
        Mr. Mark P. Strain
        Mr. Rex D. VanMiddlesworth
        Mr. John Francis Williams
        Mr. James Zhenghui Zhu